# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### SENIOR JUDGE MARCIA S. KRIEGER

Criminal Action No. 16-cr-00169-MSK-GPG

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**ROBERT TIMOTHY ALLEN,**

    Defendant.

---

## OPINION AND ORDER AFFIRMING DETENTION ORDER
---

**THIS MATTER** comes before the Court pursuant to Mr. Allen's Motion for Writ of Habeas Corpus **(# 37)**, which the Court has construed as a motion seeking review of the Magistrate Judge's December 18, 2018 detention order **(# 20)**. The factual record consists of an incomplete[1] transcript of the December 17, 2018 bond hearing **(# 41)**, supplemented by the parties' proffers of additional factual material **(# 42, 45)**, and Mr. Allen's oral statements at a hearing on March 28, 2019 **(# 38)**. More recently, Mr. Allen has filed a Motion for Pretrial Release **(# 51)**, raising similar issues and arguments.

---

[1] Due to a technical error, the initial portion of the December 17, 2018 bond hearing was not recorded. When that error came to the Court's attention, it notified the parties accordingly **(# 39)** and requested that the parties submit, by proffer, "any . . . evidence the party believes should be reviewed by the Court in making its determination." Both parties submitted written proffers; neither party requested an evidentiary hearing.

1

**FACTS**

On May 10, 2016, Mr. Allen was charged in a one-count Indictment **(# 1)** with damaging public lands in violation of 18 U.S.C. § 1361. The Government represents that its evidence would show that, beginning in or about July 2013, Mr. Allen engaged in unauthorized mining activity on BLM land in Saguache County, Colorado. BLM rangers made contact with Mr. Allen on several occasions, informing him that unauthorized mining on public lands was prohibited and issuing him written orders to cease his activities, but Mr. Allen refused to do so. Mr. Allen's unauthorized activities continued into at least May 2014.

Upon Mr. Allen's indictment in May 2016, a summons **(# 3)** was issued, directing Mr. Allen to appear before a Magistrate Judge on May 18, 2016. The Gunnison County Sheriff's Office contacted Mr. Allen for the purpose of serving the summons and requested that Mr. Allen meet with the Sheriff on May 11, 2016. Mr. Allen did not appear, but his wife[2] met with the Sheriff's Office on that date and informed them that Mr. Allen questioned the constitutionality of the summons. A second meeting was held the following day. Once again, Mr. Allen did not appear but his wife did. A Special Agent of the BLM was present and explained the nature of the summons to Mrs. Allen, requesting that Mr. Allen contact the Agent to facilitate service of the summons. Mr. Allen did not do so and the summons remained unserved as of the May 18 court date **(# 4)**.

The Magistrate Judge reset Mr. Allen's initial appearance for May 26, 2016 and re-issued the summons for that date. The Agent promptly left a voicemail for Mr. Allen, advising of the new court date and the need to complete service of the summons. Mr. Allen's wife called the

---

[2] The Government's proffer makes clear that all of Mrs. Allen's communications with authorities in May 2016 were done with the knowledge and at the direction of Mr. Allen himself.

2

Agent back, indicating that Mr. Allen refused to meet with the Agent because he was afraid that he would be arrested if he did so. The Agent advised Mrs. Allen that Mr. Allen would not be arrested if he accepted service of the summons, but that an arrest warrant would likely be the next step if he refused the summons. On May 19, 2016, Mrs. Allen called the Agent back and informed him that Mr. Allen would not accept service of the summons. The Magistrate Judge held the initial appearance as scheduled on May 26, 2016; Mr. Allen did not appear and a warrant was issued for Mr. Allen's arrest **(# 7)**.

It appears that there was some reluctance on the part of the Gunnison County Sheriff and/or the BLM Special Agent to attempt the arrest of Mr. Allen. The Sheriff advised that Mr. Allen had once referred to "Lexington and Concord" – the initial exchange of gunfire that commenced the Revolutionary War – as a way to "settle the issue of the arrest warrant." Mr. Allen was known to be a proficient marksman and to harbor anti-government beliefs. On October 31, 2016, the Special Agent contacted Mr. Allen's wife in a Wal-Mart parking lot in Gunnison, Colorado, requesting her assistance in finding a peaceful way to serve the warrant and effectuate Mr. Allen's arrest. Mrs. Allen emphasized that Mr. Allen was a "good hunter," confirmed that she and Mr. Allen "are Constitutionalists who believe the federal government is corrupt," and that they had placed a cable across their driveway to prevent uninvited persons from accessing their property. Mrs. Allen asked the Agent that, if authorities intended to arrest Mr. Allen at his home, that they use the pastor of the local church as a ruse to remove Mrs. Allen from the property first, apparently a reference to her fear that Mr. Allen might resort to violence to prevent his own arrest. The Agent emphasized to Mrs. Allen that authorities did not intend to attempt to arrest Mr. Allen at his residence so as to avoid any violent encounter.

At an unspecified point in time, Mr. Allen placed an advertisement in the local newspaper. The advertisement asked "Does the U.S. Bureau of Land Management authority fall within the powers delegated by the U.S. Constitution to the U.S. federal government?" and listed Mr. Allen's name and phone number. An undercover law enforcement officer called the number and spoke to Mr. Allen. During that conversation, Mr. Allen acknowledged his awareness of the pending warrant for his arrest and stated that he will not go into town for fear of being arrested. He told the undercover officer that he had gone to Nevada to help Clive Bundy, referencing a situation in which numerous protestors engaged in an armed standoff with law enforcement officers. He also told the officer that he had been practicing his shooting, that he and his wife "live off the grid" and on top of a ridge "where no one can get to them," that he "was not coming out of here alive," and that federal agents "use the local Sheriff's Departments" to serve warrants "because they don't want to bleed themselves."

On August 18, 2017, Mr. Allen's wife passed away unexpectedly. The Gunnison County Sheriff and coroner went to Mr. Allen's home to retrieve the body. At that time, the Sheriff spoke to Mr. Allen about the pending warrant, and Mr. Allen responded again that he would not turn himself in. Because of the circumstances, the Sheriff chose not to arrest Mr. Allen at this time. The Sheriff spoke with Mr. Allen again in October 2017, and Mr. Allen again refused to turn himself in on the warrant.

At some point in time, Mr. Allen spoke by phone with Mr. Chaffin, the Assistant United States Attorney prosecuting this case. Mr. Chaffin offered to vacate the warrant and schedule an initial appearance in court for Mr. Allen and to not seek detention if Mr. Allen would agree to appear. Mr. Chaffin warned that if Mr. Allen did not agree, the Government would likely seek detention if Mr. Allen was subsequently arrested on the warrant. Although Mr. Chaffin gave Mr.

4

Allen an opportunity to contact the U.S. Marshal to schedule an appearance in court, Mr. Allen never did so.

In the fall of 2018, the government conducted surveillance of Mr. Allen's property and spoke to a source familiar with Mr. Allen. The source advised that Mr. Allen had cables strung across his driveway to block entrance to his property and that he barricaded the entry door to his residence. The source identified a blue jeep that occasionally visited the property as belonging to Mr. Allen's in-laws, and indicated that Mr. Allen would occasionally drive the in-laws to medical appointments in the jeep. Authorities obtained a warrant to place a tracking device on the jeep. In or about December 2018, authorities tracked the jeep to a shopping area in Gunnison. Marshals approached the jeep, ascertained that Mr. Allen was in or near it along with his in-laws, and advised him that he was under arrest. Mr. Allen resisted, struggling with the Marshal who was attempting to take him into custody, and Mr. Allen's father-in-law assaulted the BLM agent who was assisting. Both Mr. Allen and his father-in-law were eventually taken into custody.

With a single exception, Mr. Allen's own submissions do not dispute the facts discussed above. Mr. Allen recounts the circumstances of his arrest somewhat differently. He states that he was walking his mother-in-law back to the jeep after a medical appointment when "plainly clothed gentlemen step[ped] out from behind a tree and sa[id] 'Mr. Allen, it's all over.'" Mr. Allen acknowledges that he "attempted to run," but was tackled and injured in the process. He denies fighting or resisting the Marshal arresting him and denies any knowledge of any confrontation between his father-in-law and any of the authorities attempting the arrest.

Mr. Allen identifies certain reasons why he believes that continued detention is inappropriate. He notes that, because he is proceeding *pro se*, he is required to conduct his own

5

legal research and review his own discovery materials, and that that process is substantially more difficult while incarcerated. He states that computers at the Jefferson County jail cannot reliably access the electronic versions of the discovery materials and that if he possesses paper copies of discovery records, he will not be able to review them in private without other inmates nearby.

Mr. Allen also notes that his elderly in-laws are limited in their ability to drive and maintain a household and that they rely on Mr. Allen to perform various essential tasks for them, including shopping, cooking, and driving them to medical appointments. Mr. Allen's mother-in-law tendered her own letter to the Court attesting to the same facts.

Mr. Allen acknowledges "concerning statements" attributed to him in the Government's proffer, but states that he was "not in the right frame of mind" in late 2017, owing to grief over the death of his wife. He also notes that he was not represented by counsel at the time and that he was "unreasonably suspicious of what might happen to him" if he turned himself in. He states that, now having been advised of his rights and obligations by counsel, he "will not fail to appear at scheduled court dates" if released.

## **ANALYSIS**

18 U.S.C. § 3145(b) provides that a defendant may request that the presiding Article III judge review and amend or revoke any detention order issued by a magistrate judge. In undertaking such review, the Court applies the same standards that applied to the initial detention hearing, as set forth in 18 U.S.C. § 3142, but considers the facts *de novo*. *U.S. v. Cisneros*, 328 F.3d 610, 616 n. 1 (10th Cir. 2003). The Government bears the burden of proving that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), *Cisneros*, 328 F.3d at 616. The Court considers: (i) the nature and circumstances of the offense

charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including factors such as his physical and mental condition, family ties, financial resources, past conduct, and record concerning attendance at court proceedings; and (iv) the nature and seriousness of the danger to any person in the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g)(1)-(4).

Considering the §3142(g) factors serially, although the charges against Mr. Allen involve non-violent property offenses that are relatively minor in consequence, there is significant evidence indicating that he was repeatedly advised by BLM rangers that he needed authorization to mine and that he chose to ignore those advisements.  Thus, the weight of the evidence against him is substantial. The Court is cognizant that the weight of the evidence factor is not simply a pre-adjudication of the merits of the case, but rather, is considered to the extent that it bears on the issues of risk of non-appearance or harm to the community.  See e.g. *U.S. v.Lizardi-Maldonado*, 275 F.Supp.3d 1284, 1292 (D.Ut. 2017).  Here, if Mr. Allen is convicted of a felony, he will likely be barred from continuing to own firearms.  *See* 18 U.S.C. § 922(g)(1).  The record reflects that firearms ownership is a substantial component of Mr. Allen's current lifestyle and identity, and thus, the likelihood of being subjected to a permanent ban on firearms possession is yet another factor that might push Mr. Allen to seek to stall or avoid these proceedings.

Far more importantly, the history and characteristics of Mr. Allen himself, particularly his interactions with law enforcement authorities, are cause for grave concern.  Mr. Allen was fully aware that criminal charges had been lodged against him and that he was required to appear in court to answer those charges.  Over a period of more than two years, numerous efforts were made by various governmental officials to secure his voluntary appearance in court, and Mr. Allen was offered a variety of accommodations to facilitate that appearance. Nevertheless, Mr.

Allen steadfastly refused to appear and made veiled threats to resist – violently if necessary – any attempts to compel him to appear.  It is reasonable to assume that, if released, Mr. Allen would again take refuge in his well-guarded home and resume his refusal to submit to the court's jurisdiction.  Thus, the Court finds that the Government has carried its burden of demonstrating that there is a substantial risk that, if released, Mr. Allen would not appear as required and that no release condition or combination of conditions would alleviate that risk.

Although Mr. Allen now asserts that his years-long resistance was simply the result of "unreasonabl[e] suspicio[n]" and the lack of advice from counsel, the Court is not persuaded.  Mr. Allen had many opportunities between May 2016 and December 2018 to seek legal advice from any attorney he trusted in order to allay his suspicions about what would happen if he surrendered to the court, but there is no indication that he ever did so.  To the contrary, the record reflects that Mr. Allen has long maintained a hostility towards the government in general and has given support to those who reject the court's authority, and his refusal to submit to the legal process in this case is entirely consistent with those beliefs.  The Court does not necessarily find that Mr. Allen's present assurances that he will comply to be insincere, but there is nothing in the record that assures the Court that his recent reversal of his otherwise long-held attitudes to the contrary will continue as the case winds on.

Moreover, if Mr. Allen did renege on his promise to appear for all future hearings, there are no changed circumstances that would suggest that another years-long standoff would result.  Mr. Allen remains in possession of firearms and continues to live in the same residence – presumably with the same defenses – that frustrated law enforcement officials' ability to quickly

execute the original warrant. Mr. Allen has not identified any conditions of release[3] that he would accept that would diminish the risk to those officials or facilitate their ability to once again take him into custody if the need arose.

The Court is mindful of Mr. Allen's other circumstances, most significantly his in-laws' dependence upon him for assistance with needs of daily living. But those needs can be met in a variety of alternative ways -- *e.g.* with the assistance of other family and friends, with the assistance of volunteer or paid aides, through other governmental or charitable services made available to the elderly and infirm -- that do not require Mr. Allen's release. Indeed, as Mr. Allen notes, he has already been detained for several months. There is no indication that whatever interim arrangements his in-laws have made during that period cannot be continued for the duration of this case.

The Court also finds that the difficulties that Mr. Allen has in preparing a defense while detailed does not overcome concerns about his non-appearance if released. Mr. Allen has chosen to represent himself, as is his constitutional right. But the difficulties of self-representation while in custody do not constitute a basis for release of a person who would otherwise be detained; to hold otherwise would give an incentive to defendants to terminate their counsel and proceed *pro se* – often to their own detriment – in order to obtain pre-trial release. Moreover, Mr. Allen can always change his mind about representing himself. A system that allowed release on bond because of self-representation could easily be manipulated by defendants who elect to proceed

---

[3] Electronic monitoring is a classic condition imposed to address a defendant's risk of non-appearance, but such a condition would be of little effect here. The problem is not that law enforcement officials do not know where Mr. Allen *is*, it is that they are wary of attempting to remove him from that location. Likewise, confinement of Mr. Allen in a halfway house or other community corrections program would not prevent him from absconding and returning to hunker down in his own residence.

*pro se* only long enough to secure their release, then rescind that decision and accept the assistance of counsel thereafter. The Court has no doubt that it is difficult for Mr. Allen to prepare a defense while detained, but his decision to proceed *pro se* was made with his full knowledge of the fact of his ongoing detention and the knowledge of the difficulties that would ensue.

Finally, because the Court finds that Mr. Allen's risk of non-appearance is itself enough to justify his continued detention, it need not dwell extensively on the final factor, risk of harm to the community that might result from his release. Nevertheless, there is evidence that Mr. Allen presents some degree of risk to the safety of the community, particularly government officials. The Court need not resolve the dispute between the parties regarding the circumstances of Mr. Allen's actual arrest. It is sufficient to observe that Mr. Allen has, on various occasions, threatened or implied that he would use violence against government officials. Such concerns about the safety of government officials who encounter him thus also weigh, minimally, in favor of Mr. Allen's continued detention.

Accordingly, Mr. Allen's motions **(# 37, 51)** seeking reconsideration of the Magistrate Judge's detention order are **GRANTED IN PART**, insofar as the Court has reviewed *de novo* the appropriateness of the Magistrate Judge's detention order pursuant to 18 U.S.C. § 3145(b), and **DENIED IN PART**, insofar as upon such review, the Court finds that such detention order was properly issued pursuant to 18 U.S.C. § 3142(e) and should remain in place pending trial. Consistent with 18 U.S.C. § 3142(*i*), the Court directs that Mr. Allen shall remain in the custody of the U.S. Attorney General for confinement in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Mr. Allen shall be afforded reasonable opportunity to confer with his advisory counsel and to review

materials and prepare his defense, subject to legitimate security concerns in the facility where he is housed. Upon the request of the Court or the United States Attorney, the administrator of the facility where Mr. Allen is housed shall deliver him to the custody of a United States Marshal for the purposes of ensuring his appearance at court appearances in this matter.

Dated this 17th day of May, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge